## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CUTTING UNDERWATER TECHNOLOGIES** | * | **CIVIL ACTION** |
| **USA, INC.** | * | |
| | * | **NO. 09-387** |
| **VERSUS** | * | |
| | * | **SECTION "L"(2)** |
| **CON-DIVE, LLC ET AL.** | * | |

## ORDER & REASONS

Before the Court is a Motion for Summary Judgment (Rec. Doc. No. 83) filed by T.

Baker Smith, Inc. (TBS), a Motion for Summary Judgment (Rec. Doc. No. 75) filed by Eni U.S.

Operating Co. and Eni Petroleum U.S., LLC (collectively Eni), and a Motion to Strike the

Affidavit of Scot Childress (Rec. Doc. No. 101) filed by TBS. The Court has reviewed the

submitted memoranda and the applicable law and is ready to rule. For the following reasons,

TBS's motion for summary judgment is granted, and Eni's cross-motion is denied. In addition,

the motion to strike is treated as an objection and sustained in part and overruled in part.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case arises out of contracts for the provision of services in connection with the

removal of a toppled platform on the Outer Continental Shelf (OCS).[1] In September 2005,

Hurricane Rita toppled and dismantled the Vermilion Block 313-A platform located offshore

Vermilion Parish, Louisiana. At that time, the platform was no longer in service, the oil and gas

wells to which it was connected had been plugged, and the casings connecting the wells to the

---

[1] This factual background reflects the allegations made in the pleadings of Eni and TBS.
This section should not be construed as findings of fact.

platform had been cut. In March 2007, Dominion Exploration & Production, Inc., the then-

lessee, entered into a contract with Con-Dive, LLC, under which Con-Dive agreed to remove the

toppled platform. In turn, Con-Dive subcontracted various work to T. Baker Smith, Inc. (TBS),

Cutting Underwater Technologies USA, Inc., and Cheramie Marine LLC. In its contract with

Dominion, Con-Dive warranted that it would not allow any liens to be asserted over Dominion's

property.

In June 2007, Dominion conveyed 50 percent of its record title and operating rights in the

lease to Eni Petroleum. Together with Eni Operating, Eni Petroleum also acquired all of

Dominion's contractual rights and obligations relating to the lease. Con-Dive eventually failed to

pay TBS and the other subcontractors for the services they rendered. In response, in October

2008, Cutting Underwater filed suit in state court against Con-Dive. In November and December

2008, TBS, Cutting Underwater, and Cheramie Marine also recorded liens over Eni's property in

the records of Vermilion Parish. In January 2009, Cutting Underwater amended its state court

petition, adding Eni as defendant. In its petition, Cutting Underwater asked that Con-Dive be

held liable for breach of contract and that its lien over Eni's property be recognized as valid

under the Louisiana Oil Well Lien Act (LOWLA), La. Rev. Stat. Ann. § 9:4861 *et seq.*

Eni subsequently removed the suit to this Court on the basis of federal-question

jurisdiction under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* A flurry of

pleadings were then filed, resulting in various additional claims being asserted. In particular, Eni

made claims against Con-Dive for breach of contract and against Cutting Underwater, TBS, and

Cheramie Marine for invalid liens under LOWLA.[2] Similarly, TBS and Cheramie Marine asserted claims against Con-Dive for breach of contract and against Eni for recognition and enforcement of their liens.[3] In September 2009, Cheramie Marine settled all of the claims that were asserted by it and against it, and in October 2009, Cutting Underwater did the same. This left in place the lien-related claims that TBS and Eni asserted against each other, as well as the breach-of-contract claims that TBS and Eni asserted against Con-Dive.

In January 2010, TBS filed a motion for summary judgment on its breach-of-contract claim against Con-Dive. In February 2010, the Court granted the motion as unopposed and, on the motion of TBS, entered judgment pursuant to Federal Rule of Civil Procedure 54(b). Since then, however, Con-Dive has not satisfied that judgment. As a result, the dispute between TBS and Eni regarding the validity of TBS's lien remains pending, and it is that which is the subject of the present motions.[4]

## II. PRESENT MOTIONS

### A. Cross-Motions for Summary Judgment

---

[2] Although Eni styled its claims against TBS and Cheramie Marine as counterclaims, they are more appropriately viewed as third-party claims, for TBS and Cheramie Marine were not parties in this case before Eni asserted claims against them and thereby impleaded them as third-party defendants. *See* Fed. R. Civ. P. 14.

[3] TBS's pleading does not expressly name Eni as a counter-defendant, but paragraph 17 of its counterclaim and its prayer for relief indicate that it has instituted an action against Eni for the recognition and enforcement of its lien under LOWLA. *See* TBS Answer (Rec. Doc. No. 30). Eni has understood TBS to have asserted such a claim, and accordingly, it has filed an answer to that claim. *See* Eni Answer (Rec. Doc. No. 31).

[4] In seeking recognition and enforcement of its lien, TBS also asserts that it is entitled to the cost of preparing and filing the lien and to attorney's fees pursuant to La. Rev. Stat. Ann. § 9:4862(B). The Court does not reach these issues, which were not addressed in the parties' motions.

In its Motion for Summary Judgment and its opposition to TBS's cross-motion, Eni argues that TBS's lien is invalid because it did not perform an "operation" within the meaning of LOWLA. La. Rev. Stat. Ann. §§ 9:4861(4)(a), 9:4862(A)(1). In particular, Eni asserts that the work undertaken by TBS was neither performed "for the purpose of . . . abandoning a well" nor done "on a well site." *Id.* § 9:4861(4)(a). Eni argues that the wells attached to the Vermilion Block 313-A platform had been plugged and that the casings that connected the platform to the wells had been cut in 1999. According to Eni, this forecloses a finding that any work subsequently performed involves "abandoning a well." *Id.* Eni also contends that for work to be performed "on a well site," it must have been "physically carried out" on such a site.

In its own Motion for Summary Judgment and its opposition to Eni's cross-motion, TBS asserts that its lien is valid under LOWLA, and it disputes both of the arguments raised by Eni. TBS states that the work that it performed was a necessary part of "abandoning a well" within the meaning of the statute. TBS emphasizes that once wells connected to a platform are no longer in production, the applicable federal regulations require the lessee not only to plug the wells, but also to remove the production platform. TBS argues that in light of this requirement, the work that it performed is part and parcel of the process by which Eni abandoned the depleted wells. In addition, TBS asserts that the work it performed was on a "well site" as defined by LOWLA because it was present in Vermilion Block 313 near the vicinity of the platform in order to deliver the survey and positioning services that it was asked to provide.

**B. Motion to Strike the Affidavit of Scot Childress**

Separately, TBS has filed a Motion to Strike the Affidavit of Scot Childress, which Eni has supplied along with its Motion for Summary Judgment (Rec. Doc. No. 75-6). TBS

4

specifically objects to paragraph 11 of the affidavit on the ground that it states an ultimate conclusion in this case. TBS also challenges paragraphs 7 through 13 of the affidavit on the ground that the statements are not based on personal knowledge. Eni opposes the motion. Eni argues that Mr. Childress's statement in paragraph 11 does not state an ultimate conclusion. It also asserts that given Mr. Childress's employment with Dominion and Eni, he has personal knowledge to testify as to the matters addressed in paragraphs 7 through 13 of his affidavit.

## III. LAW AND ANALYSIS

TBS's Motion to Strike affects the scope of the record that is to be considered in deciding the parties' cross-motions for summary judgment. Accordingly, the Court will first address that motion and then discuss the cross-motions.

### A. Motion to Strike the Affidavit of Scot Childress

Rule 56 of the Federal Rules of Civil Procedure allows a party to provide an affidavit to support or oppose a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A). Such affidavits, however, "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4). Prior to December 1, 2010, the proper method by which to attack an affidavit was by filing a motion to strike. *See, e.g.*, *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1990), *superseded on other grounds by* Fed. R. Evid. 103(a); *see also* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (3d ed. 2004). Under the now-applicable Rule 56(c)(2),[5] however, it is no longer necessary for a party to file

---

[5] Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

such a motion; instead, the party may simply object to the material. *See* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments ("There is no need to make a separate motion to strike."). In light of this change, TBS's Motion to Strike will be treated as an objection.

As noted above, TBS objects to paragraph 11 of Mr. Childress's affidavit on the ground that it states an ultimate conclusion. Though resisted by Eni, this argument has merit. Indeed, "ultimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary-judgment motion." Wright & Miller, *supra*, § 2738; *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985). Here, one of the questions that is presented by the cross-motions is whether the work that TBS performed is an "activity for the purpose of drilling, completing, testing, producing, reworking, or abandoning a well" and thus an "operation" within the meaning of LOWLA. *See* La. Rev. Stat. Ann. § 9:4861(4)(a)(i). Answering this question requires the Court to interpret the statutory phrase "abandoning a well" and then apply that interpretation to the facts of this case.[6]

In paragraph 11 of his affidavit, Mr. Childress states that none of the work performed by TBS "involved drilling, completing, testing, producing, reworking, or abandoning any of the wells." Eni's Ex. 2 para 11 (Rec. Doc. No. 75-6). Eni contends that a statement by Mr. Childress that TBS performed an "operation" would be an ultimate conclusion, but that his statement that TBS did not do work that involved "abandoning any of the wells" is merely "a statement of the facts as [Mr. Childress] understands them." This is not a persuasive argument. Given how

---

[6] This matter is on cross-motions for summary judgment. Ordinarily, this would require the Court to resolve the disputed facts in favor of TBS with respect to Eni's motion and to resolve the disputed facts in favor of Eni with respect to TBS's motion. As noted below, however, the facts that are determinative of this question are not disputed.

remarkably close Mr. Childress's statement tracks the language of the relevant statute, it is difficult not to understand his averment as one that directly states an answer to the critical question in this case.[7] To the extent that paragraph 11 thus states an ultimate conclusion, it is not proper summary judgment evidence and must be disregarded.

TBS also challenges paragraphs 7 through 10, as well as paragraphs 12 and 13, of Mr. Childress's affidavit on the ground that Mr. Childress does not have the personal knowledge to make the statements contained in those paragraphs. This contention is unavailing. Personal knowledge may be demonstrated by showing that the facts stated "reasonably" fall within the "'sphere of responsibility'" of the affiant as a corporate employee. *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (quoting *Hodges v. Exxon Corp.*, 563 F. Supp. 667, 669 (M.D. La. 1983)); *see also Rutledge v. Liab. Ins. Indus.*, 487 F. Supp. 5, 7 (W.D. La. 1979) ("An official title alone is enough to indicate the basis of personal knowledge . . . ."). Moreover, personal knowledge does not necessarily mean contemporaneous knowledge. *See Dalton v. FDIC*, 987 F.2d 1216, 1223 (5th Cir. 1993). Here, Mr. Childress's affidavit and his deposition indicate that during the relevant time period, he has been the manager of production operations for the lease at issue. *See* Eni's Ex. 2 (Rec. Doc. No. 75-6); Eni's Ex. 2 (Rec. Doc. No. 110-1). This is a sufficient basis upon which to infer that Mr. Childress has personal knowledge of the facts contained in those paragraphs.

In addition, the record reveals that Mr. Childress was designated as the representative of Eni under Rule 30(b)(6) of Civil Procedure. *See* Eni's Ex. 2 (Rec. Doc. No. 110-1). Under that

---

[7] It would be a different situation had Mr. Childress stated in his affidavit that, for instance, the term "abandoning a well" has a particular technical meaning and that the work performed by TBS does not fall within the scope of that technical meaning.

rule, a corporate designee "does not testify as to his personal knowledge or perceptions." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006). Rather, "he testifies 'vicariously,' for the corporation, as to its knowledge and perceptions." *Id.* (quoting *Resolution Trust Corp. v. S. Union*, 985 F.2d 196, 197 (5th Cir. 1993)). There is no indication, beyond the mere fact that Mr. Childress had not reviewed certain documents, that he was unprepared to testify as to the matters addressed in paragraphs 7 through 10, as well as 12 and 13, of his affidavit. Thus, Mr. Childress's status as the designee of Eni further indicates that these statements constitute competent summary judgment evidence. Accordingly, the Court concludes that TBS's objection to the affidavit of Mr. Childress under Rule 56(c)(2) is to be sustained as to paragraph 11, but overruled in all other respects.

**B. Cross-Motions for Summary Judgment on the Validity of TBS's Lien**

Having addressed TBS's Motion to Strike, the Court is now ready to discuss the cross-motions for summary judgment. The Court will first describe the generally applicable standard of review for motions for summary judgment. The Court will then analyze the applicable law and answer the two key questions that the parties have raised in their briefs.

**1. Standard of Review**

A district court can grant a motion for summary judgment only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable

8

jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (citations omitted).

## 2. The Validity of the Lien

### a. The applicable law

This Court has subject matter jurisdiction over the instant matter pursuant to the Outer Continental Shelf Lands Act (OCSLA). *See* 43 U.S.C. § 1349(b)(1). In enacting that statute, Congress declared that the United States has jurisdiction over the seabed and subsoil of the OCS. *See id.* § 1332(1). Congress also "extended" the application of federal law to the OCS "as if the [OCS] were an area of exclusive Federal jurisdiction located within a State." *Id.* § 1333(a)(1). Finally, Congress declared that "[t]o the extent that they are applicable and not inconsistent with [federal law]," the laws of the adjacent states are "the law[s] of the United States" on the OCS. *Id.* § 1333(a)(2)(A). As the Supreme Court has explained, this last provision reflects Congress's recognition that "the Federal Code was never designed to be a complete body of law in and of

itself," *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 358 (1969), and that as a consequence, there is a need "to fill the substantial 'gaps' in the coverage of federal law," *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480 (1981). Thus, under the OCSLA, state law may be applicable to disputes arising out of the OCS, albeit "only as surrogate federal law." *Rodrigue*, 395 U.S. at 357.

The Louisiana Oil Well Lien Act (LOWLA) was significantly revised in 1995. *See* La. Rev. Stat. Ann. § 9:4861 historical and statutory notes; *see also* Patricia H. Chicoine, *Lien on LOWLA; It's a Privilege: Recent Revisions to the Louisiana Oil Well Lien Act*, 57 La. L. Rev. 1133, 1133 (1997). The revisions have not, however, disturbed the view of the Fifth Circuit that LOWLA is applicable as federal surrogate law under the OCSLA. *Compare Wilson Indus., Inc. v. Aviva Am. Inc.*, 185 F.3d 492, 493-94 & nn. 1 & 3 (5th Cir. 1999) (applying revised statute), *with Gardes Directional Drilling v. U.S. Turnkey Exploration Co.*, 98 F.3d 860, 864-66 (5th Cir. 1996) (applying previous statute), *and Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1050-51 (5th Cir. 1990) (same). Both TBS and Eni have also assumed that LOWLA applies. Accordingly, the Court concludes that LOWLA is applicable as federal law in this case.

Under LOWLA, a subcontractor may assert a lien over the property of an operator or lessee in order to secure "the price of his contract for operations." La. Rev. Stat. Ann. § 9:4862(A)(1).[8] By making available this privilege, the statute aims to "protect [subcontractors]

---

[8] The statute refers to "contractors," La. Rev. Stat. Ann. § 9:4862(A)(1), but it broadly defines that term as including "a person . . . who, by subcontract with a contractor of the operator . . . , contracts to perform all or part of the operations contracted for by the operator," *id.* § 9:4861(10). The term "operator" means "a lessee who is personally bound by contract . . . to a contractor from whom the claimant's activities giving rise to the privilege emanate." *Id.* § 9:4861(7). A "lessee" is "a person who owns an operating interest." *Id.* § 9:4861(6). Eni and TBS do not disagree that Eni is a "lessee" within the meaning of LOWLA. In addition, if the

10

from the default of those who engage them." *Guichard Drilling Co. v. Alpine Energy Servs., Inc.*, 657 So.2d 1307, 1312 (La. 1995). As the Louisiana Supreme Court has observed, the statute reflects the "policy decision that the lease owners are in a far better position to ensure payment for the subcontractor's services than is the subcontractor, and that the onus should be on the lease owners to ensure that the contractor it hires is solvent and that it actually makes payment to the subcontractor." *Id.* at 1313. The statute "clearly place[s] the risk of the contractor's insolvency or failure to pay on those with an interest in the lease." *Id.* at 1312-13.

Of course, LOWLA applies only to "operations" encompassed by the statute. La. Rev. Stat. Ann. § 9:4862(A)(1). Here, the critical question is whether TBS has performed such "operations." *Id.* The statute defines that term as including "every activity conducted by or for a lessee on a well site for the purpose of drilling, completing, testing, producing, reworking, or abandoning a well." *Id.* § 9:4861(4)(a)(i). In this case, TBS and Eni dispute whether the work that TBS performed falls within this definition. In particular, Eni argues that the work that TBS performed was neither done "for the purpose of . . . abandoning a well" nor performed "on a well site." *Id.* TBS rejects this contention. It asserts that the work it performed was done "for the purpose of . . . abandoning a well" and done "on a well site." *Id.* The Court will address these issues in turn.

### b. Whether the work done was "for the purpose of . . . abandoning a well"

In their briefs, Eni and TBS have presented divergent views of the statutory phrase "every activity . . . for the purpose of . . . abandoning a well." *Id.* As noted above, Eni argues that

---

platform removal project is an "operation," then Eni is an "operator" and TBS is a "contractor" within the meaning of the statute.

the process of abandoning wells does not encompass the removal of the platform to which the wells were connected. Eni contends that once the wells are plugged and the conductors are cut, any additional work that is performed on the former site of production is not work that involves "abandoning a well" within the meaning of LOWLA. TBS advances a different view of the statutory phrase. TBS notes that once the wells that are connected to a production platform are depleted, lessees are required by federal regulations to implement a number of decommissioning obligations, including plugging the wells, cutting the conductors, removing the platform, and clearing the site. TBS asserts that in light of these requirements, work done to remove a platform is in fact part and parcel of the process of abandoning the wells that were connected to the platform.

This is a close question, one that appears to be *res nova*, and both parties have presented strong arguments. The Court, however, is persuaded that TBS has the correct view of the statute. As one commentator has observed, "[t]he definition of 'operations' has been drafted broadly." Chicoine, *supra*, at 1137. Indeed, the statutory phrase is aimed at encompassing "all typical well site activities," including  "[w]ork associated with the abandonment of wells." *Id.* at 1137-38. As further explained below, it is clear that in light of the applicable federal regulations, the removal of a platform after the depletion of the wells that are connected to that platform is a common well site activity, one that is, in effect, part of the process of abandoning the wells. Accordingly, the Court concludes that work done to remove a platform following the depletion of wells properly falls within the ambit of the statutory term "operations."

Federal regulations have long indicated that following well depletion, the removal of a platform is a typical well site activity and that it is integral to the process of abandoning the

depleted wells connected to the platform. In particular, the federal regulations that have been in effect since 2002 – and that were thus applicable at the time that TBS participated in the project at issue – provide that "[w]hen [the] facilities are no longer useful for operations," the lessee "must," among other things, "[p]ermanently plug all wells" and "[r]emove all platforms and other facilities." 30 C.F.R. § 250.1703.[9] The predecessor regulations -- which took effect in 1997 and were thus applicable in 1999 when the wells attached to Platform 313-A were plugged -- delineated, in a similar fashion, the decommissioning obligations of a lessee.[10] Under the heading "Abandonment of Wells," the regulation provided that "[l]essees must plug and abandon all well bores [and] remove all platforms or other facilities." Surety Bonds for Outer Continental Shelf Leases, 62 Fed. Reg. 27948, 27955 (1997) (codified at 30 C.F.R. § 250.110(b)).[11] These provisions demonstrate that, notwithstanding revisions over time, the applicable regulations have carried forward a longstanding requirement that idle platforms be removed once oil and gas production ceases. *See, e.g.*, Interpretation Concerning Authority to Depart from OCS

---

[9] The regulations exempt lessees and operators from the requirement of removing platforms if the structure becomes part of an artificial reef program. *See* 30 C.F.R. 250.1730.

[10] The term "decommissioning" is the new term for "abandonment." *See* Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Decommissioning Activities, 65 Fed. Reg. 41892, 41893 (2000). *Compare also Mariner Energy, Inc. v. Devon Energy Prod. Co.*, 690 F. Supp. 2d 558, 564 (S.D. Tex. 2010) ("Decommissioning means permanently plugging all wells, removing all platforms and other facilities . . . and clearing the seafloor of obstructions."), *with* Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* (14th ed. 2009) (defining "abandonment" as "[p]lugging a well, removal of installation, and termination of operations for production from the well").

[11] This provision was later redesignated as 30 C.F.R. § 250.700(b), *see* Redesignation of 30 C.F.R. Part 250 – Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 63 Fed. Reg. 29478, 29479 (1998), and eventually removed and reserved when its now-applicable version was codified at a different subpart of the Code of Federal Regulations in 2002, *see* Oil and Gas and Sulphur Operations in the Outer Continental Shelf – Decommissioning Activities, 67 Fed. Reg. 35398, 35405 (2002).

Requirements, 48 Fed. Reg. 31397, 31397 (1983) (noting that "the rules governing OCS operations require the removal of platforms and other structures no longer in use for oil and gas recovery").

A variety of reasons underlie the requirement that lessees remove a platform once the wells to which it is connected are depleted. The Bureau of Energy Management, Regulation and Enforcement (BOEMRE), which was spun off from the now-defunct Minerals Management Service (MMS), has made the general observation that "idle infrastructure poses a potential threat to the OCS environment." BOEMRE, Notice to Lessees and Operators No. 2010-G05, Decommissioning Guidance for Wells and Platform 1 (2010) [hereinafter BOEMRE, NTL]. In particular, the presence of idle platforms may harm navigation safety. *See, e.g.*, National Research Council, *Disposal of Offshore Platforms* 53 (1985) ("The Coast Guard is especially concerned about the threat to navigation safety of permitting offshore platforms to remain in place when they are no longer actively being used to produce oil and gas."). BOEMRE has also observed that if not removed in a timely manner, an idle platform can become "a financial liability . . . if subsequently destroyed or damaged in a future event such as a hurricane." BOEMRE, NTL, *supra*, at 1.

Under the federal regulations, platform removal has become a common activity on the Gulf of Mexico OCS. The official statistics compiled by BOEMRE underscore this reality. *See* BOEMRE, Installation and Removals – Offshore Production Facilities in Federal Waters, *available at* http://www.boemre.gov/stats/PDFs/OCSPlatformActivity.pdf (accessed March 22, 2011) [hereinafter BOEMRE, Statistics]. The statistics show that while the number of platform installations dwarfed the number of platform removals for several decades, platforms removals

eventually increased such that they outnumbered platform installations in 1992 and 1993. *See id.* at 1. Those were the years when the Louisiana State Law Institute began to update LOWLA in order to make it "compatible with the ever changing character of oil and gas operations." Chicoine, *supra*, at 1134. From 1991 to 2000, there were sufficient platforms removed from the Gulf of Mexico OCS to largely stabilize the number of platforms in the region. *See* BOEMRE, Statistics, *supra*, at 1. And over the last decade, platform removal has substantially outpaced platform installation, causing the number of platforms on the Gulf of Mexico OCS to drop from a peak of 4,045 in 2001 to 3,409 in 2010. *Id.*

Thus, the story of Platform 313-A is, at its core, the typical story of a platform removed in accordance federal regulations following the end of oil and gas production. The record indicates that by April 1999, the wells that were connected to the production platform were plugged and the associated conductors cut. Eni's Ex. 1 (Rec. Doc. No. 75-5). Soon thereafter, in May 1999, a proposed plan to remove Platform 313-A, which had been first installed in 1975, was submitted to MMS. *See* TBS's Ex. 9 (Rec. Doc. No. 98-2). The proposal suggested that well depletion was the reason for the removal of the platform. *See id.*[12] Although a delay subsequently ensued, another proposed plan to remove the platform was submitted to MMS in March 2005, *see* TBS's Ex. 5 (Rec. Doc. No. 98-2). That proposal also specified that the platform was to be removed because the "[w]ells are depleted." *Id.*

While Hurricane Rita caused yet another delay, TBS's Ex. 3 (Rec. Doc. No. 98-2), in 2008, after permission to leave the platform as an artificial reef was denied, *see* Eni's Ex. 2 (Rec.

---

[12] The proposal states that the "[p]latform is depleted." *See* TBS's Ex. 9 (Rec. Doc. No. 98-2). The only reasonable way of understanding that statement is to conclude that it refers to the wells themselves.

Doc. No. 75-6), a proposal to remove the platform was once again submitted, *see* TBS's Ex. H (Rec. Doc. No. 83-3). Thus, the record demonstrates that before the platform was eventually removed, the successive lessees of Vermilion Block 313 remained aware of and repeatedly sought to meet their obligation to remove the platform given that the wells that were connected to it had been depleted. *See, e.g.*, Eni's Ex. 2 (Rec. Doc. No. 75-6) ("The Platform had been scheduled to be decommissioned as required by [MMS] . . . ."); TBS's Ex. A (Rec. Doc. No. 83-3) (acknowledging that BOEMRE "require[s] the removal of platforms when wells are depleted").

What may perhaps make the story of Platform 313-A somewhat unusual is the substantial amount of time that lapsed between the plugging of the wells and the removal of the platform that was connected to them. As noted above, the plugging of the wells took place in 1999, but it was not until 2008 that the platform was removed. The intervention of Hurricane Rita in 2005 may also distinguish the story of Platform 313-A from those of others. Neither of these, however, changes the fact that under the applicable federal regulations, the removal of a platform following the depletion of the wells that are connected to it is a typical well site activity, one that is largely inseparable from the plugging of the wells and thus, in effect, part and parcel of the process of abandoning the depleted wells.

In its brief, Eni argues that the wells that were connected to the platform were "plugged and abandoned" in 1999, and it contends that any further work on the former site of production cannot be considered part of the process of "abandoning a well." Eni thus suggests that the term "abandoning a well" should be equated with the term "plugging and abandoning." This argument does not take Eni very far, however, because the contours of the term "plug and abandon" are

16

unclear. As the record demonstrates, "plug and abandon," on the one hand, may entail only the placing of cement plugs in a well and the cutting of the conductors. *See* Eni's Ex. 11 (Rec. Doc. No. 96-25). On the other hand, as evidenced by a host of documents prepared by Eni itself, the term may also be used to encompass a broader swath of decommissioning activities, such as the disposal of a platform. *See, e.g.*, TBS's Ex. 3 (Rec. Doc. No. 98-2) ("The platform was secured for P&A prior to Rita."); TBS's Ex. 4 (Rec. Doc. No. 98-2) ("[T]he platform . . . was planned for P&A but was not removed due to the hurricane.").

The inconsistent use of the term "plug and abandon" is evident elsewhere. For instance, other industry players have used the term to denote the full range of decommissioning activities mandated by federal regulations. *See, e.g.*, TBS's Ex. 12 (Rec. Doc. No. 98-2) ("If CNGP were to P&A the Vermilion 313 'A' platform"); *Mariner Energy, Inc. v. Devon Energy Prod. Co.*, 690 F. Supp. 2d 558, 570 (S.D. Tex. 2010) (considering a contract that defined "plugging and abandonment costs" as "including . . . removal and abandonment of platforms [and] wells"). Courts too have sometimes used the term to refer to the package of decommissioning obligations that OCS lessees must satisfy. *See, e.g.*, *In re Tri-Union Dev. Corp.*, 314 B.R. 611, 615 (Bankr. S.D. Tex. 2004) (using the term "Offshore P & A Obligations" to denote the "obligations to plug and abandon [the] offshore wells, remove offshore oil and gas platforms, pipelines, facilities, conduct site clearance operations, and perform additional decommissioning activities").

Ultimately, the elusive nature, and potentially expansive scope, of the term "plug and abandon" is perhaps most clearly demonstrated by the definition supplied in a leading reference for this area of law. That reference defines "plug and abandon" as "the placing of a plug in a dry hole, then abandoning the well." Howard R. Williams & Charles J. Meyers, *Manual of Oil and*

17

*Gas Terms* (14th ed. 2009). What it means to place a plug in a dry hole is, of course, fairly clear. *See id.* (defining "dry hole" as "[a] completed well which is not productive of oil and/or gas or which is not productive of oil and/or gas in paying quantities"). The definition, however, begs the question of what it then means to "abandon[] the well." *Id.* It, in effect, brings us back to the very initial question. Given the lack of clarity that surrounds the term "plug and abandon," the Court is reluctant to simply equate the statutory phrase "abandoning a well" with that somewhat elusive term. Moreover, it should be noted, to the extent that "plugging and abandoning" does denote the full range of decommissioning activities, it indicates that platform removal does fall within the ambit of the statute.

In its brief, Eni sets forth a related, but distinct argument. Eni notes that after the wells were plugged and the conductors cut, the wells connected to Platform 313-A were deemed to be "permanently abandoned." Eni contends that having thus carried out its obligations under what is now 30 C.F.R. §§ 250.1710-.1717, any additional work that is performed cannot be considered as part of "abandoning a well" within the meaning of LOWLA. Eni thus argues that the phrase "abandoning a well" is limited to the work that is required under those sections of the Code of Federal Regulations. This argument appears to have some force. Like the Court's analysis above, it recognizes that LOWLA is applied in this case as surrogate federal law, and it seeks to construct LOWLA in the light of the surrounding body of federal law. *See, e.g.*, La. Civ. Code art. 13 ("Laws on the same subject matter must be interpreted in reference to each other"); *Branch v. Smith*, 538 U.S. 254, 281 (2003) (plurality opinion) (noting that it is "the most rudimentary rule of statutory construction . . . that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes").

But the weakness in Eni's argument is that it does not take into account the shift in terminology that has occurred in the applicable federal regulations. It is true that previously, the Code of Federal Regulations had used the term "permanent abandonment." *See* Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 53 Fed. Reg. 10596, 10733 (1988) (codified at 30 C.F.R. § 250.112).[13] The regulations had even used the phrase "plug and abandon." *See* Surety Bonds for Outer Continental Shelf Leases, 62 Fed. Reg. 27948, 27955 (1997) (codified at 30 C.F.R. § 250.110(b)).[14] But in 2002, the federal regulations were revised, and both of these terms were discarded. *See* Oil and Gas and Sulphur Operations in the Outer Continental Shelf – Decommissioning Activities, 67 Fed. Reg. 35398, 35406-35409 (2002). Since then, the applicable regulations, including those to which Eni has drawn the Court's attention, simply use the phrase "permanently plug" instead of "permanently abandon" or "plug and abandon." *See, e.g.*, 30 C.F.R. § 250.1703 (noting that the lessee must "[p]ermanently plug all wells"); *see also id.* §§ 250.1710-.1717 (same).

This shift in terminology is telling. Indeed, it appears to reflect the recognition that depleted wells that are attached to a production platform are not properly abandoned until the full range of decommissioning activities – including the plugging of the wells and the removal of the platform – is carried out and that, accordingly, it would be inaccurate and confusing to use the term "permanent abandonment" to denote only one aspect of the decommissioning process.

---

[13] This provision was redesignated as 30 C.F.R. § 250.702, *see* Redesignation of 30 C.F.R. Part 250 – Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 63 Fed. Reg. 29478, 29479 (1998), and eventually removed and reserved when the revised and now-applicable version took effect, *see* Oil and Gas and Sulphur Operations in the Outer Continental Shelf – Decommissioning Activities, 67 Fed. Reg. 35398, 35405 (2002).

[14] The subsequent history of this provision is discussed in footnote 11.

19

Eni's attempt to find significance in the term "permanent abandonment" is therefore not persuasive. The federal regulations have evolved to make it clear that the abandonment of wells attached to a platform consists of more than just the plugging of the wells. While there are discrete decommissioning tasks that a lessee must perform, they are largely inseparable and, in effect, constitute a single process by which lessees are to abandon the wells once they are depleted.

Finally, in its brief, Eni invokes the principle that lien statutes are, in general, subject to strict construction, and it argues that a fundamental distinction must therefore be made between the plugging of wells and the subsequent removal of a platform. Once again, this argument has some force, but ultimately, it is also unavailing. The Louisiana Supreme Court has indeed acknowledged that "[a]s a general rule, lien statutes are *stricti juris* and should thus be strictly construed." *Guichard Drilling*, 657 So.2d at 1313. But, in the same breadth, it has also indicated that courts should interpret LOWLA "in a manner which will effectuate its purposes" and that the courts should not "erect artificial barriers to its enforcement." *Id.*; *cf. Phillips Petroleum Co. v. Best Oilfield Servs., Inc.*, 48 F.3d 913, 916 (5th Cir. 1995) (noting that a "reasonable construction" must be considered before adopting a strict construction). The court has thus cautioned that the narrowest construction of the statute is not invariably the correct one.

While LOWLA may not be "a model of clarity," *Ogden Oil Co. v. Servco, Div. of Smith Int'l, Inc.*, 611 F. Supp. 572, 576 (M.D. La. 1985), it is aimed at encompassing "all typical well site activities," including "[w]ork associated with the abandonment of wells," Chicoine*, supra*, at 1137. As discussed above, the applicable federal regulations that govern oil and gas operations on the OCS clearly indicate that the removal of a platform following the depletion of the wells

20

that are connected to it is a typical well site activity that it is, in effect, part and parcel of the process of abandoning the depleted wells. In light of this regulatory scheme, it is clear that to accept Eni's contention that LOWLA does not encompass any work that is performed subsequent to the plugging of the wells would be to establish the sort of "artificial barrier" against which the Louisiana Supreme Court has warned. *Guichard Drilling*, 657 So.2d at 1313.

In light of the foregoing, the Court therefore concludes that work performed to remove a platform following the depletion of the wells connected to that platform constitutes work done to "abandon[] a well" under LOWLA. La. Rev. Stat. Ann. § 9:4861(4)(a)(i). The application of this statutory phrase to the facts of this case is straightforward. Here, the undisputed facts show that along with several other subcontractors, TBS took part in a project to remove Platform 313-A after the wells to which it was connected had become depleted. *See, e.g.*, TBS's Ex. D-A (Rec. Doc. No. 83-3). The Court therefore concludes that the work performed by TBS is done "for the purpose of . . . abandoning a well" within the meaning of LOWLA. La. Rev. Stat. Ann. § 9:4861(4)(a)(i).

**b. Whether the work was done "on a well site"**

The remaining question is whether TBS performed work "on a well site." *Id.* § 9:4861(4)(a). LOWLA defines the term "well site" as "the area covered by the operating interest," *id.* § 9:4861(12)(a), a term that denotes "a mineral lease . . . or an interest in a lease . . . that gives the lessee, either singly or in association with others, the right to conduct the operations giving rise to the claimant's privilege," *id.* § 9:4861(5)(a). One commentator has observed that this definition provides "broader" coverage than the previous version of LOWLA, "which tied the provision of services or equipment to the 'well or wells'" themselves. Chicoine,

*supra*, at 1142. Under the now-applicable statute, "the well site is not restricted to the exact physical location of a well." *Id.*

In this case, the essential facts that are relevant to the question of whether TBS performed work "on a well site" are not in dispute.  La. Rev. Stat. Ann. § 9:4861(4)(a). The parties agree that Eni is the owner of 50 percent of the record title and operating rights in the lease that encompasses Vermilion Block 313, *see* Eni's Ex. 2 (Rec. Doc. No. 75-6); that Eni has thereby acquired the right to drill, produce, and abandon oil and gas wells in Block 313, *see* TBS's Ex. A (Rec. Doc. No. 83-3); and that the toppled platform that was removed, Platform 313-A, was located in the block encompassed by the lease, *see id.*

The undisputed evidence also shows that under its subcontract, TBS conducted a sonar survey of the site prior to the removal of the toppled platform; assisted with the positioning of vessels, divers, and equipment during the removal operation; and conducted a post-salvage survey of the site. *See* TBS's Ex. D-A (Rec. Doc. No. 83-3); TBS's Ex. D-B (Rec. Doc. No. 83-3); Eni's Ex. 2 (Rec. Doc. No. 75-6). The performance of these tasks required TBS personnel to be in Vermilion Block 313. *See* TBS's Ex. D-A (Rec. Doc. No. 83-3); TBS's Ex. D-B (Rec. Doc. No. 83-3). Thus, TBS personnel was onboard the M/V OCEAN COMMANDER, which was used as a primary vessel for the removal project and deployed to Vermilion Block 313. *See, e.g.*, Eni's Ex. 2 (Rec. Doc. No. 75-6); TBS's Ex. D-B (Rec. Doc. No. 83-3). In light of these undisputed facts, and given that "the well site" under LOWLA "is not restricted to the exact physical location of a well," Chicoine, *supra*, at 1142, it is clear that TBS rendered services "on a well site" within the meaning of the statute.

In its brief, Eni cites several cases for the contrary proposition, but all of these cases are

22

distinguishable. In both *Matte Services Corp. v. ONYX Consulting Engineers, LLC*, No. 06-3020, 2007 WL 1087592 (E.D. La. 2007), and *J. Ray McDermott, Inc. v. Berry Contracting L.P.*, Nos. 03-2054 & 03-2099, 2004 WL 224583 (E.D. La. 2004), the subcontractors were given contracts to construct decks that were to be subsequently installed on structures on the OCS. *See Matte Servs.*, 2007 WL 225483, at *1; *J. Ray McDermott*, 2004 WL 224583, at *1. The subcontractors conceded that most, if not all, of the work that they performed was done onshore. *See Matte Servs.*, 2007 WL 225483, at *3; *J. Ray McDermott*, 2004 WL 224583, at *8. Here in contrast, it is undisputed that TBS provides its labor and services in Vermilion Block 313 in the vicinity of Platform 313-A.

The third and last case cited by Eni is also distinguishable. In *Samedan Oil Corp. v. Ultra Fabricators, Inc.*, 737 So.2d 846 (La. Ct. App. 3d Cir. 1999), the court considered the application of the former version of LOWLA, *see id.* at 853. Given that the now-applicable version of LOWLA provides a "broader" conception of the term "well site," Chicoine, *supra*, at 1142, the conclusion of the court in *Samedan Oil* that the lien holder did not perform work at the requisite location is of little significance. Furthermore, *Samedan Oil* is factually distinguishable because the party that asserted the lien in that case merely leased cranes for the construction of platforms and structures, *id.* at 848, and those cranes were placed at an onshore site, *id.* at 853. As noted above, TBS in this case provided labor and services offshore in Vermilion Block 313.

In sum, the Court concludes that by providing survey and positioning services in Vermilion Block 313 in order to help remove a platform following well depletion, TBS performed "operations" under LOWLA. La. Rev. Stat. Ann. § 9:4861(4)(a). The work that it did was both "on a well site" and involved "abandoning a well" within the meaning of the statute. *Id.*

23

Accordingly, the lien that it has asserted is valid and enforceable. *See id.* § 9:4862(A)(1).

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that TBS's Motion to Strike the Affidavit of Scot Childress (Rec. Doc. No. 101) is treated as an objection and hereby **SUSTAINED IN PART AND OVERRULED IN PART** as set forth above.

**IT IS FURTHER ORDERED** that TBS's Motion for Summary Judgment (Rec. Doc. No. 83) is hereby **GRANTED**. As noted above, the Court does not reach the issue of miscellaneous relief claimed by TBS under La. Rev. Stat. Ann. § 9:4862(B).

**IT IS FURTHER ORDERED** that Eni's Motion for Summary Judgment (Rec. Doc. No. 75) is hereby **DENIED**. Eni's claim that the TBS lien is invalid and unenforceable is hereby **DISMISSED** with prejudice.

New Orleans, Louisiana, this 22nd day of March, 2011.

UNITED STATES DISTRICT JUDGE

24